UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| SAFELITE GROUP, INC., *et al.*, <br>     *Plaintiffs*, <br><br> *v.* <br><br> GEORGE JEPSEN, *et al.*, <br>     *Defendants*. | Civil No. 3:13cv1068 (JBA) <br><br><br> December 18, 2013 |

**RULING DENYING PLAINTIFFS' MOTION
FOR A PRELIMINARY INJUNCTION**

On June 3, 2013, Connecticut Daniel Governor Malloy signed House Bill 5072, "An Act Concerning Automotive Glass Work," into law as Public Act 13-67 ("PA 13-67") to take effect on January 1, 2014. The law is targeted at insurance companies doing business in Connecticut and third-party claims administrators or adjusters that also own automotive glass-repair shops, and mandates that if such entities recommend the use of their affiliated glass repair shop to insurance policyholders, they must also provide the name of at least one non-affiliated repair shop. Plaintiffs Safelite Group, Inc. and Safelite Solutions LLC (collectively "Safelite" or Plaintiffs) seek declaratory and injunctive relief, contending that portions of PA 13-67 violate their rights under the First and Fourteenth Amendments (Count One) and the Dormant Commerce Clause (Count Two). Plaintiffs now move [Doc. # 2] for a preliminary injunction enjoining Defendants (the "State")

from implementing or enforcing PA 13-67(c)(2).[1]  For the reasons that follow, Plaintiffs'

motion is denied.

I.      **Facts**

        A.      **Background**

        Safelite, based in Columbus, Ohio, owns Safelite Solutions, which provides claims

management services for 18 of the top 30 insurance companies.  (O'Mara Decl. ¶ 3, Ex. 1

to Pls.' Mem. Supp.)  Safelite Solutions typically manages the entire claims process for an

insurance company, maintaining a telephone hotline for policyholders to report claims

and schedule appointments for repairs.  (*Id.* ¶ 6.)  Safelite also owns Safelite AutoGlass,

the largest vehicle-glass repair company in the United States, serving more than 4.5

million customers each year.  (*Id.*)

        If a policyholder does not express a preference for a particular vehicle glass repair

shop, Safelite operators will recommend a glass repair shop based on the policyholder's

location and the preferences of his or her insurance company.   Many insurance

companies that employ Safelite Solutions as their claims administrator have selected

Safelite AutoGlass as one of their preferred glass repair shops, and Safelite operators

recommend that policyholders use Safelite AutoGlass for their repairs because Safelite

believes that its own shops provide the best customer service and are the most reliable.

(*Id.* ¶ 9–11.)   If there is no Safelite AutoGlass location near the claimant, Safelite

operators may refer him or her to an independent glass repair shop from Safelite's

network of non-affiliated shops, which have agreed to certain pricing terms and other

---

        [1] By agreement of the parties, Plaintiffs are not seeking a preliminary injunction
on their Dormant Commerce Clause claim.  (*See* Defs.' Mem. Opp'n [Doc. # 42] at 3 n.1.)

conditions regarding their work.  (*Id* ¶ 7.)  Because most customers do not frequently utilize vehicle glass repair services and rely upon Safelite's telephone operators, Safelite contends that its recommendations provide policyholders with "an extremely valuable service." (*Id.* ¶ 10.)

Although there are over 70 non-affiliated repair shops in Connecticut that are part of Safelite's network, from January 1, 2012 to June 30, 2013, insureds selected Safelite AutoGlass for their repairs approximately 55% of the time.  (See Pls.' Amend. Resp. and Obj. to Def. Inter. and Req. for Prod. at Inter. No. 13., Ex. A to Defs.' Mem. Opp'n.) Some of Safelite's insurance company clients require Safelite to provide policyholders with the name of a non-Safelite affiliated repair shop in addition to Safelite AutoGlass.  In such instances, the rate at which customers utilize Safelite AutoGlass drops to as low as 41%.  (*Id.*)

Against this background, the Connecticut General Assembly debated PA 13-67. The Insurance and Real Estate Committee of the Connecticut General Assembly heard testimony that only two third-party insurance claims administrators maintained relationships with auto glass repair shops in Connecticut: Safelite Solutions and a Massachusetts-based company, which was associated with a Massachusetts-based automotive glass repair shop.  (*See* Comm. Hearing, Ex. 5 to Pls.' Mem. Supp. at 61.)

Existing Connecticut law already prohibits "steering"—the practice of an insurer or claims administrator requiring a customer to use a particular auto repair shop—and further mandates that written estimates for repairs contain boldface disclosures to customers of their right to select a repair shop of their choice.  *See* Conn. Gen. Stat. § 38a-354.   The Connecticut Insurance Department submitted written testimony to the

Committee stating that no customers had complained of being coerced into using a particular repair shop against their will, and opined that PA 13-67 was "unnecessary" because "consumers are adequately protected by current law." (State of Conn. Ins. Dep't, Testimony Before the Ins. and Real Estate Comm., Conn. Gen. Assembly (Jan. 31, 2013), Ex. 3 to Pls.' Mem. Supp. at 1.)

Numerous Connecticut legislators advocated for the law on the basis that it would benefit in-state businesses over out-of-state companies, while some legislators' statements also indicate that the law was motivated to protect consumers from the undue influence of insurance company-affiliated repair shops. For example, Rep. Robert W. Megna explained that "the essence of this bill" was that insurance companies and third-party claims administrators "can't tell an individual to have their automotive glass replaced at a particular shop." (Conn. Gen. Assembly House of Rep. Session Unofficial Tr. (May 7, 2013), Ex. 4 to Defs.' Mem. Supp. at 62.) Rep. Megna expanded his explanation that the bill would "help out those small businesses that employ people, spend money, do economic development—in our state while at the same time prevent[ing] an insurer from essentially trying to influence the place where your automobile gets fixed which is in their best financial interest." (*Id.*)

**B.      Public Act 13-67**

In May 2013, the General Assembly adopted PA 13-67, which provides in relevant part:

> No glass claims representative for an insurance company doing business in this state or a third-party claims administrator for such company shall provide an insured with the name of, schedule an appointment for an insured with or direct an insured to, a licensed glass shop that is owned by

> (A) such company, (B) such claims administrator, or (C) the same parent company as such insurance company or claims administrator, unless such representative or claims administrator provides the insured with the name of at least one additional licensed glass shop in the area where the automotive glass work is to be performed.

PA 13-67(c)(2).[2]

The State contends that "[i]mplicit in Connecticut's enactment of P.A. 13-67 is the legislative determination that Connecticut's existing statutes did not adequately protect consumer choice or prevent insurance claims administrators with affiliated repair shops from steering work to their affiliated shops." (Defs.' Mem. Opp'n at 4.)  Safelite contends that the true purpose of the law was to help out local small businesses at the expense of large out-of-state companies and that this purpose was expressly stated by multiple legislators during debate over the bill.

## II.   Discussion

"[A] preliminary injunction is an extraordinary remedy that should not be granted as a routine matter."  *JSG Trading Corp. v. Tray–Wrap, Inc.,* 917 F.2d 75, 80 (2d Cir. 1990).  "Generally, preliminary injunctive relief is appropriate when the movant shows '(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary

---

[2] In their Complaint, Plaintiffs also challenge the constitutionality of PA 13-67(b)(2) and Conn. Gen. Stat. § 38a-354(b)(2), which both prohibit Safelite from telling claimants that choosing a non-affiliated repair shop will result in delays or a lack of guarantee for the work.  Plaintiffs have not moved to preliminarily enjoin these provisions.

relief.'" *Int'l Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67, 70 (2d Cir. 1996) (quoting *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir. 1979)).   An injunction that "stays 'government action taken in the public interest pursuant to a statutory . . . scheme' . . . must satisfy the more rigorous 'likelihood of success prong.'" *Id.* (quoting *Able v. United States,* 44 F.3d 128, 131–32 (2d Cir. 1995) (first alteration in original)).   In addition, the "loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury." *New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013) (quoting *Elrod v. Burns,* 427 U.S. 347, 373 (1976)).

### A.   Commercial Speech

"There is no longer any room to doubt that what has come to be known as 'commercial speech' is entitled to the protection of the First Amendment, albeit to protection somewhat less extensive than that afforded 'noncommercial speech.'" *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 637 (1985).  "Commercial speech that is not false or deceptive and does not concern unlawful activities . . . may be restricted only in the service of a substantial governmental interest, and only through means that directly advance that interest."  *Id.* at 638.   In *Central Hudson Gas & Electric Corp., v. Public Service Commission of New York,* 447 U.S. 557 (1980), the Supreme Court articulated the test for determining whether a restriction on commercial speech is constitutionally permissible:

> For commercial speech to come within [the First Amendment], it at least must concern lawful activity and not be misleading.  Next, we ask whether the asserted governmental interest is substantial.  If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.

*Id.* at 566.

Initially, both parties contended that *Central Hudson* controlled here despite the "material differences between disclosure requirements and outright prohibitions on speech" in the commercial context. *Zauderer*, 471 U.S. at 650. In other contexts, the protections of the First Amendment prohibit compelled speech in addition to compelled silence. *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 133 S. Ct. 2321, 2327 (2013) (It is "a basic First Amendment principle that 'freedom of speech prohibits the government from telling people what they must say.'"). "'Purely commercial speech,'" however, "'is more susceptible to compelled disclosure requirements' than is personal or political speech." *New York State Rest. Ass'n v. New York City Bd. of Health*, 556 F.3d 114, 132 (2d Cir. 2009) (quoting *Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 796 n.9 (1988)).

After the Court asked the parties to address whether the Supreme Court's analysis in *Zauderer* should control in light of the Second Circuit's holdings in *New York State Rest. Ass'n* and *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104 (2d Cir. 2001), Defendants adopted the position that *Zauderer*, and not *Central Hudson*, should control. Plaintiffs maintained that because provisions of PA 13-67 restrict speech and PA 13-67(c)(2) mandates "controversial" and not purely "factual" speech, *Central Hudson* still applies.

In this Circuit, the Supreme Court's analysis in "*Zauderer,* not *Central Hudson Gas & Electric Corp.* . . ., describes the relationship between means and ends demanded by the First Amendment in compelled commercial disclosure cases. The *Central Hudson* test should be applied" only "to statutes that *restrict* commercial speech." *Sorrell*, 272

F.3d at 115.  In *Zauderer,* the Supreme Court upheld an Ohio law that required attorney advertisements referring to contingent-fee rates to specify whether fees were computed before or after the deduction of court costs and expenses, and to disclose that clients would be liable for costs (as opposed to legal fees) if they lost.   471 U.S. at 633.  The Supreme Court reasoned that "[b]ecause the extension of First Amendment protection to commercial speech is justified principally by the value to consumers of the information such speech provides, appellant's constitutionally protected interest in *not* providing any particular factual information in his advertising is minimal."  *Id.* at 651 (internal citation omitted).  The compelled warnings were justified because they were "reasonably related to the State's interest in preventing deception of consumers," who might not understand "the distinction between 'legal fees' and 'costs,'" and might incorrectly conclude "that employing appellant would be a no-lose proposition in that his representation in a losing cause would come entirely free of charge."  *Id.* at 652.

The Supreme Court cautioned, however, "that unjustified or unduly burdensome disclosure requirements might offend the First Amendment by chilling protected commercial speech."  *Id.*  Ohio, however, had not attempted to "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein."   *Id.* (internal quotation marks omitted). Instead, the state had "attempted only to prescribe what shall be orthodox in commercial advertising, and its prescription has taken the form of a requirement that appellant include in his advertising purely factual and uncontroversial information about the terms under which his services will be available."  *Id.*

The distinction between *Central Hudson* and *Zauderer* is critical here.   Under *Central Hudson*, the State has the burden of demonstrating that its speech restriction advances a substantial state interest in a "in a direct and material way." *Edenfeld v. Fane,* 507 U.S. 761, 767 (1993)).   The Supreme Court has "made clear that if the Government could achieve its interests in a manner that does not restrict speech, or that restricts less speech, the Government must do so." *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 371 (2002).   Under *Zauderer*, however, "laws mandating factual disclosures are subject to the rational basis test" only, *New York State Rest. Ass'n*, 556 F.3d at 133 n.21, and there need only be "a rational connection between the purpose of a commercial disclosure requirement and the means employed to realize that purpose," *Sorrell*, 272 F.3d at 115. The State "has no obligation to produce evidence, or empirical data to sustain . . . rationality." *New York State Rest. Ass'n*, 556 F.3d at 135 n.23 (quoting *Lewis v. Thompson*, 252 F.3d 567, 582 (2d Cir. 2001)) (alterations in original).

Further, the State need not establish that its disclosure requirement is the "least restrictive means," nor that the law is not "under-inclusive:"

> Because the First Amendment interests implicated by disclosure requirements are substantially weaker than those at stake when speech is actually suppressed, we do not think it appropriate to strike down such requirements merely because other possible means by which the State might achieve its purposes can be hypothesized.   Similarly, we are unpersuaded by appellant's argument that a disclosure requirement is subject to attack if it is "under-inclusive"—that is, if it does not get at all facets of the problem it is designed to ameliorate.   As a general matter, governments are entitled to attack problems piecemeal, save where their policies implicate rights so fundamental that strict scrutiny must be applied.   The right of a commercial speaker not to divulge accurate information regarding his services is not such a fundamental right.

*Zauderer*, 471 U.S. at 651 n.14 (internal citation omitted).

While the speech requirement in *Zauderer* was intended to combat deceptive advertising, the Second Circuit has held that "*Zauderer's* holding was broad enough to encompass" "laws mandating factual disclosures . . . even if they address non-deceptive speech." *New York State Rest. Ass'n*, 556 F.3d at 133 & n.21.  For example, in *Sorrell*, the Second Circuit upheld a Vermont statute that required the manufacturers of enumerated mercury-containing products to label their products and packaging to inform consumers that the products contained mercury and should be recycled or disposed of as hazardous waste.  272 F.3d at 107.  The law was not intended to combat consumer deception, "but rather to better inform consumers about the products they purchase" with the hope that newly informed consumers would properly dispose of mercury-containing products and thereby protect "human health and the environment from mercury poisoning."  *Id.* at 115–16.  Applying *Zauderer*, the Second Circuit concluded that the statute was "rationally related" to the state's environmental goal.  *Id.* at 115.

Eight years later in *New York State Rest. Ass'n*, the Second Circuit upheld a New York City Health Code regulation that sought to combat rising rates of obesity by requiring chain restaurants to post the calorie content of items on their menus.  556 F.3d at 117.  An association of restaurants argued that the mandate forced them "to communicate to their customers that calorie amounts should be prioritized" over other nutritional indicators, such as fat, sodium, and cholesterol.  *Id.* at 134.  Although the restaurants conceded that calorie content was "factual," they contended that they did "not believe that disclosing calorie information would reduce obesity," and they should not have "to 'cram' calorie information 'down the throats' of their customers."  *Id.* at 133.

10

The Second Circuit concluded that New York City's regulation was rationally related to its goal of reducing obesity and that under *Zauderer*, the city was not precluded from requiring "'under-inclusive' factual disclosures." *Id.* at 134.

> **B.**     **The Proper Analytical Framework**

The standard of review applicable here depends upon whether PA 13-67(c)(2) restricts commercial speech or merely mandates the disclosure of purely factual information.  Initially, both parties analyzed the issue under the *Central Hudson* standard as if PA 13-67(c)(2) in fact restricts speech.  Safelite contends that in prohibiting it from referring a customer to its affiliated repair shop unless it also "recommends" an unaffiliated shop, the State provides "an unconstitutional choice between censorship and compelled speech."  (Pls.' Mem. Supp. [Doc. # 2-1] at 26.)

At oral argument on December 2, 2013, the State clarified that, as the text of PA 13-67(c)(2) suggests, Safelite need not "recommend" another shop; it merely has to "provide[] the insured with the name" of an additional shop.   Indeed, PA 13-67(c)(2) does not restrict what Safelite can say regarding its own shops, and the State represented that Safelite could explicitly inform callers that it is mandated by law to also provide the name of a non-affiliated repair shop and could even say that Safelite did not recommend that shop and instead recommend using Safelite AutoGlass.  (Dec. 2, 2013 Oral Argument Tr. [Doc. # 49] at 27.)  At oral argument on December 16, 2013, the State acknowledged, however, that Safelite is confined by PA 13-67(b)(2)'s prohibition on stating to claimants that choosing a non-affiliated repair shop "will result in delays in or a lack of guarantee for the automotive glass work."

11

Although Safelite does not seek to preliminarily enjoin PA 13-67(b)(2), it contends that this provision restricting speech combined with PA 13-67(c)(2)'s compelled speech on the same subject matter moves the analysis from *Zauderer* to *Central Hudson* territory.  In support of this contention, Plaintiffs cite the Supreme Court's decision in *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229 (2010), upholding a federal statute compelling debt relief agencies to include certain disclosures in their advertisements, such as "that the assistance [sought] may involve bankruptcy relief."  *Id.* at 233 (quoting 11 U.S.C. § 528(b)(2)(A)).  The Supreme Court applied *Zauderer* rather than *Central Hudson*, explaining that because the statute "is directed at *misleading* commercial speech . . . . and because the challenged provisions impose a disclosure requirement rather than an affirmative limitation on speech, the . . . less exacting scrutiny described in *Zauderer* governs our review."  *Id.* at 249.  Plaintiffs contend that this passage demonstrates that *Zauderer* only applies when there are no restrictions on speech.

Whether the speech restrictions of PA 13-67(b)(2) violate the First Amendment on their own is not at issue here, because Plaintiffs have not sought a preliminary injunction regarding this provision.  Additionally, even if PA 13-67(b)(2) imposes a speech restriction that is properly analyzed under *Central Hudson*, it does not necessarily follow that the entire statute, and in particular, PA 13-67(c)(2) must be analyzed under *Central Hudson*.  In fact, in *Zauderer* itself, the Supreme Court applied *Central Hudson* to strike down two restrictions that had been applied to an attorney advertisement while upholding the disclosure requirement as applied to the same advertisement.  *See Zauderer*, 471 U.S. at 638.  In doing so, the Supreme Court rejected the very argument

12

that Safelite now advances—that the *Central Hudson* analysis must be applied to the disclosure requirements just as it was applied to the speech restrictions.  *Id.* at 650. Likewise, a portion of the statute at issue in *Milavetz* restricted a debt relief agency from advising a person to "incur more debt in contemplation of" a bankruptcy filing.  *Milavetz*, 559 U.S. at 233.[3]

Additionally, the Second Circuit has made clear that despite "the existence of 'doctrinal uncertainties left in the wake of Supreme Court decisions,'" including *Milavetz*, "'from which the modern commercial speech doctrine has evolved,'" courts in the Second Circuit are still "bound by precedent distinguishing commercial and noncommercial speech and applying different standards of review to laws mandating commercial speech disclosures and laws restricting commercial speech."  *Connecticut Bar Ass'n v. United States*, 620 F.3d 81, 93 n.15 (2d Cir. 2010) (quoting *Bad Frog Brewery, Inc. v. N.Y. State Liquor Auth.,* 134 F.3d 87, 94 (2d Cir. 1998)); *see also id.* at 95 (noting that the Second Circuit's "conclusion that [the same statute as was at issue in *Milavetz*] regulates only commercial speech comports with this court's prior treatment of similar disclosure requirements." (citing *New York State Restaurant Ass'n,* 556 F.3d at 131–32 and *Sorrell*, 272 F.3d at 113)).  Accordingly, *Milavetz* does not mandate a different approach from the Second Circuit's analysis in *New York State Rest. Ass'n* and *Sorrell.*

---

[3] The Supreme Court interpreted the phrase to refer "to a specific type of misconduct designed to manipulate the protections of the bankruptcy system," i.e. "advising a debtor to incur more debt because the debtor is filing for bankruptcy, rather than for a valid purpose."  *Id.* at 243.  Adopting this "narrower reading" of the restriction, the Supreme Court upheld the provision.  *Id.* at 242.

In fact, Safelite acknowledges that PA 13-67(c)(2) contains no restrictions on speech. *See* Pls.' Mem. Supp. at 25 ("The law *permits* all speech by Safelite as long as that speech is accompanied by a referral to an unaffiliated vehicle glass repair shop."). Indeed, PA 13-67(c)(2) does not restrict what Safelite can say, but rather, as the State contended at oral argument on December 16, 2013, creates a "trigger," mandating that Safelite provide the name of a competitor if, and only if, Safelite directs claimants to its affiliated repair shops.

Safelite also contends that cases upholding compelled commercial disclosure are all limited to purely factual disclosures intended to combat potential false or misleading information. It contends that there are no cases that have upheld a disclosure requirement that is specifically triggered by the speaker's making of another statement. But the regulation at issue in *Zauderer* is not meaningfully different; it did not prohibit attorney advertisements but rather required that, if made, such communications be accompanied by appropriate disclosures.

Plaintiffs also contend that *Zauderer* is inapplicable because PA 13-67(c)(2) goes beyond mandating "purely factual and uncontroversial" information. *See Zauderer*, 471 U.S. at 651. Safelite contends that the disclosure is "controversial" for three reasons: (1) Safelite is forced to make it against its will; (2) the disclosure is related to a competitor rather than itself; and (3) in the context in which it is made, the disclosure will be misleadingly seen by claimants as an endorsement of its competitors. It contends that the information is not "factual," because Safelite is required to exercise judgment in order to decide which non-affiliated repair shop to present to its customers.

These arguments are unavailing.  Just because there are no objective criteria describing exactly which non-affiliated repair shops Safelite must name, it does not follow that the disclosures are no longer "purely factual and uncontroversial information."  PA 13-67(c)(2) does not require it to express any opinion at all regarding these names nor to take a position in any ongoing debate.  Safelite's latitude to expressly inform consumers that it does not recommend the non-affiliated repair shop it is compelled to name mitigates any risk that providing the name could be seen as an implied endorsement of that business.  The name of a business is a far cry from an encroachment upon the core First Amendment values discussed in *Zauderer*, i.e., an attempt to "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion."  *Zauderer*, 471 U.S. at 651.  In fact, beyond location, nothing in PA 13-67(c)(2) limits the number of non-affiliated repair shops that Safelite can provide to claimants, reducing the degree of judgment that Safelite must exercise.  *See* PA 13-67(c)(2) (requiring the provision of "the name of at least one additional licensed glass shop").

Similarly, the fact that Safelite would prefer to not make the required disclosure is insufficient to make it "controversial."  For example, in *New York State Rest. Ass'n*, the plaintiffs specifically objected that the disclosure requirements forced them to communicate a message that they found disagreeable—that "disclosing calorie information would reduce obesity" and that it should be prioritized over other nutritional indicators, such as fat, sodium, and cholesterol in evaluating whether food is healthy.  *See* 556 F.3d at 133–34; *see also Zauderer v*, 471 U.S. at 650 ("Ohio has not attempted to prevent attorneys from conveying information to the public; it has only required them to provide somewhat more information than they might otherwise be inclined to present.").

At oral argument on December 16, 2013, Safelite cited *Entm't Software Ass'n v. Entm't Software Ass'n*, 469 F.3d 641, 643 (7th Cir. 2006), which addressed the constitutionality of an Illinois statute that required video game retailers to label "sexually explicit" video games with a four-inch square label with the numerals "18." Contrasting the statute with that in *Sorrell*, the Seventh Circuit held that the requirement violated the First Amendment because the compelled speech did not involve a "purely factual disclosure," but instead forced the retailer to communicate "a subjective and highly controversial message—that the game's content is sexually explicit." *Id.* at 652. A "sexually explicit" video game was defined as a video game

> that the average person, applying contemporary community standards would find, with respect to minors, is designed to appeal or pander to the prurient interest and depict or represent in a manner patently offensive with respect to minors, an actual or simulated sexual act or sexual contact, an actual or simulated normal or perverted sexual act or lewd exhibition of the genitals or post-pubescent female breast.

*Id.* at 643. Thus, the constitutional infirmity in *Entm't Software Ass'n* was in part that the "State's definition of this term is far more opinion-based than the question of whether a particular chemical is within any given product." *Id.* at 652 (citing *Sorrell*, 272 F.3d at 114). Importantly, the state conceded that its law was a content-based restriction on speech subject to strict scrutiny, and although the Seventh Circuit cited *Sorrell*, its analysis focused not on commercial speech but rather on the restrictions that the law imposed on core First Amendment expression in video games. *See id.* ("Because the [law] potentially criminalizes the sale of any game that features exposed breasts, without concern for the game considered in its entirety or for the game's social value for minors, distribution of

*God of War* is potentially illegal, in spite of the fact that the game tracks the Homeric

epics in content and theme.").[4]

It can hardly be said that simply providing the name of a repair shop implicates

core First Amendment values or conveys the same character of information as the term

"sexually explicit" did in *Entm't Software Ass'n*.  *See Disc. Tobacco City & Lottery, Inc. v.*

*United States*, 674 F.3d 509, 526-27 (6th Cir. 2012) (noting that *Entm't Software Ass'n*

"involved a state attempting to restrict core speech in the form of 'art and literature'")

Safelite also attempted to distinguish *Zauderer*, *New York State Rest. Ass'n*, and

*Sorrell* on the basis that in those cases the plaintiffs were required to disclose information

about themselves, whereas PA 13-67(c)(2) requires Safelite to also disclose information

about its competitors.[5]  Indeed, the State's proffered interest in promoting consumer

choice and preventing consumers from being induced to use a glass repair shop owned by

a claims administrator like Safelite has the stated intent of influencing consumer behavior

in a way that may be economically detrimental to Safelite.  But the potential economic

detriment to Safelite from identification of its competitors does not encroach upon the

---

[4] The Supreme Court subsequently confirmed that video games are expression protected by the First Amendment.  *See Brown v. Entm't Merchants Ass'n*, 131 S. Ct. 2729, 2733 (2011) ("Like the protected books, plays, and movies that preceded them, video games communicate ideas—and even social messages—through many familiar literary devices (such as characters, dialogue, plot, and music) and through features distinctive to the medium (such as the player's interaction with the virtual world).").

[5] Another provision of PA 13-67 requires Safelite to inform policyholders of their right under Connecticut law to choose the licensed glass shop of their choice.  *See* PA 13-67(1)(c)(1).  Safelite does not challenge this provision, and at oral argument on December 16, 2013, referred to this provision as a compelled purely factual disclosure that is unobjectionable.

17

core First Amendment values that *Zauderer* suggested might violate the First Amendment.[6]

Instead, the "State has attempted only to prescribe what shall be orthodox in commercial advertising." *Zauderer*, 471 U.S. at 651 (1985).  As in *New York State Rest. Ass'n* and *Sorrell*, PA 13-67(c)(2)'s compelled disclosure is intended "to better inform consumers about the products they purchase."  *Sorrell*, 272 F.3d at 115.  In fact, in *New York State Rest. Ass'n*, the statute was explicitly intended to lead consumers to make a particular choice—for "healthier food."  556 F.3d at 134–35.

Other courts have upheld disclosure requirements that, like PA 13-67(c)(2), are intended to encourage competition and reduce the economic power of a dominant player. For example, in *Pharmaceutical Care Management Ass'n v. Rowe*, the First Circuit upheld a Maine law that required pharmacy benefit managers—"middlemen in the lucrative business of providing prescription drugs" with "tremendous market power"—to disclose

---

[6] At oral argument on December 16, 2013, Safelite contended that it had found no cases in which any court upheld a requirement that a business refer to a competitor.  In *BellSouth Adver. & Publ'g Corp. v. Tennessee Regulatory Auth.*, 79 S.W.3d 506, 520 (Tenn. 2002), however, the Tennessee Supreme Court upheld a state regulation that required BellSouth to include on the cover of its phonebook the names and logos of its local competitors, because it was reasonably related to the government's interest in "informing consumers about their choices in the local telecommunications" market and "promoting free competition."  The court noted that while the rules in *Zauderer* "compelled attorneys to disclose additional information about themselves," and the Tennessee regulations compelled "BellSouth to disclose information about the identity of its competitors," the "ultimate object" of both regulations was "the same: to inform consumers."  *Id.*

to insurance companies financial arrangements with third parties that might benefit the managers to the detriment of health care providers.  429 F. 3d 294, 298 (1st Cir. 2005).[7]

The First Circuit held that the law was "reasonably related" to Maine's stated interest in preventing consumer deception and controlling prescription drug costs, and that the benefit managers had only "a minimal interest in withholding the information" that the law required of them.  *Id.* at 310.

Safelite relies heavily upon the Fifth Circuit's decision in *Allstate Ins. Co. v. Abbott*, 495 F.3d 151, 164 (5th Cir. 2007), which struck down a Texas law that prohibited "an insurer from providing to tied repair facilities a recommendation, referral or description not provided on identical terms to other preferred repair facilities."  Although the State incorrectly contends that the Texas law prohibited an insurer from recommending a body shop that it owned to its customers (*see* Defs.' Mem. Opp'n at 17), the Texas law was more restrictive than PA 13-67(c)(2), because an insurer was prohibited from "recommending" its own shop unless it also recommended an independent shop on equal terms.

---

[7] In *New York State Rest. Ass'n*, 556 F.3d  at 133, the Second Circuit cited *Rowe* with approval and noted that the First Circuit had also accepted a "broader reading" of *Zauderer*—i.e., that its more lenient review was not limited to disclosures intended to combat consumer deception.  Citing *New York State Rest. Ass'n*, *Sorrell*, and *Rowe*, courts in other circuits have noted the distinct approach taken by the First and Second Circuits. *See*, *e.g.*, *Tepeyac v. Montgomery Cnty.*, 779 F. Supp. 2d 456, 463 (D. Md. 2011) ("Some courts have suggested that the standard described in *Zauderer* controls all cases involving truthful, compelled commercial speech, even if the disclosure requirements are not intended to prevent consumer fraud."); *R.J. Reynolds Tobacco Co. v. Food & Drug Admin.*, 696 F.3d 1205, 1227 n.6 (D.C. Cir. 2012) (Rogers, *J.* dissenting) (same).

Despite this distinction, *Abbott* is similar to PA 13-67(c)(2) in other material respects, but it is nevertheless inapposite here, because the Fifth Circuit's analysis of compelled commercial speech differs significantly from that of the Second Circuit. In *Abbott*, the Fifth Circuit held that *Zauderer*'s rational basis review was limited to compelled commercial speech designed to combat "the potential for customer confusion" and instead analyzed the Texas statute under *Central Hudson*. *Id.* In *New York State Rest. Ass'n*, however, the Second Circuit explicitly rejected this limitation on *Zauderer* in favor of a "broader" reading. *See New York State Rest. Ass'n*, 556 F.3d at 133 & n.21.

Thus, the Fifth Circuit's reasoning for invalidating the law under the exacting scrutiny of *Central Hudson* is inapplicable here, and this Court will apply the more lenient *Zauderer* analysis. Under rational basis review, even if this Court were to conclude that PA 13-67(c)(2) was "under-inclusive" or did not employ the least restrictive means necessary, such findings would not provide a basis for invaliding the law as long as it is rationally related to a legitimate state interest. *See New York State Rest. Ass'n*, 556 F.3d at 134.

For similar reasons two other decisions cited by Plaintiffs are inapposite. In *Allstate Ins. Co. v. Serio*, No. 97-cv-670 (RCC), 2000 WL 554221, at *1 (S.D.N.Y. May 5, 2000), the New York Department of Insurance regulation at issue not only compelled disclosure, but also restricted speech. Insurance companies were flatly prohibited from providing policyholders with a referral or recommendation to an affiliated repair shop unless customers explicitly requested advice. *Id.* at *7. Further, insurers were prohibited from even attempting to prompt customers to ask for a referral by informing them about the existence of these restrictions or otherwise attempting to prompt customer inquiries.

20

*Id.* Given the restriction on speech, the district court analyzed the regulations under *Central Hudson* instead of *Zauderer*.[8]

Similarly, *Allstate Ins. Co. v. State of South Dakota*, 871 F. Supp. 355, 357 (D.S.D. 1994), examined a South Dakota law that contained even greater restrictions on speech than the New York regulation: a blanket prohibition on insurers advising policyholders about the existence of affiliated auto glass repair shops.  Because that statute banned certain speech, the *Central Hudson* analysis governed.

Plaintiffs also misplace reliance on *International Dairy*, 92 F.3d at 69, in which the Second Circuit applied the *Central Hudson* analysis to invalidate a Vermont statute that required manufacturers to identify products derived from cows treated with synthetic growth hormones.  Because it was undisputed that synthetic growth hormones had no effect on human health, "Vermont's sole expressed" justification for enacting the law was to safisfy "consumer curiosity" regarding the production of dairy products.  *Id.* at 73 n.1. By its own terms, the Second Circuit's ruling was limited to holding that this asserted interest "alone is not a strong enough state interest to sustain the compulsion of even an accurate, factual statement."  *Id.* at 74.  The Second Circuit distinguished *International*

---

[8]  Although  PA  13-67(b)(2)  contains  restrictions  on  speech—albeit  far  less stringent than those at issue in *Serio*—Plaintiffs have not moved for relief from this provision and only contest the compelled speech of PA 13-67(c)(2).  Additionally, *Serio* was decided before *Sorrell* and *New York State Rest. Ass'n*, and on appeal, the Second Circuit declined to address the constitutional issues and instead certified to the New York Court of Appeals the question of whether the Department of Insurance had correctly interpreted state law in promulgating the regulation at issue, *see* 261 F.3d 143, 153 (2d Cir. 2001), which the Court of Appeals held it had not, *see* 98 N.Y.2d 198, 207 (2002).  In light of this decision on state-law grounds, on remand, the district court dismissed the challenge as moot.  *See* 2003 WL 21418198, at *6 (S.D.N.Y. 2003).

*Dairy* on this basis in both *Sorrell*, 272 F.3d at 115 n.6 ("The disclosure statute at issue here, however, is based on Vermont's substantial interest in protecting human health and the environment from mercury poisoning."), and *New York State Rest. Ass'n*, 556 F.3d at 134 ("Given New York's interest in preventing obesity . . ., [*International Dairy*] is inapplicable."). Because the State has established that PA 13-67(c)(2) is based on the governmental interest in promoting consumer choice and preventing steering, *International Dairy* is inapplicable, and the Court's analysis is governed by the rational basis review outlined in *Zauderer*, *New York State Rest. Ass'n*, and *Sorrell*.

**C.    Rational Basis Review**

Under the deferential standard of rational basis review, Plaintiffs' challenge fails. They argue that the State's asserted interest in protecting consumer choice and preventing steering is merely a post-hoc rationalization for the State's true protectionist intent, which is not "not in 'protecting consumer choice' so much as it is in ensuring that consumers make particular choices" in favor of local businesses. (Reply [Doc. # 45] at 3.) Safelite also contends that the limited disclosure required by the law does not directly and materially advance the State's interest in consumer protection and is a greater imposition upon speech than is required to advance the State's limited interests. (*See* Pls.' Mem. Supp. at 25–29.)

While some legislators may have expressed a protectionist motivation during the debate over PA 13-67, under rational basis review "the Government has no obligation to produce evidence, or empirical data to sustain the rationality of a statutory classification, and instead can base its statutes on rational speculation. Any reasonably conceivable state of facts will suffice to satisfy rational basis scrutiny. The burden falls to the party

attacking the statute as unconstitutional to negative every conceivable basis which might support it." *Thompson*, 252 F.3d at 582 (internal quotation marks, citations, and alterations omitted).

Whatever might have been the motivation of some legislative proponents, there is ample basis in the record for the Court to conclude that PA 13-67(c)(2) is rationally related to the State's interest in promoting consumer choice and preventing steering. While existing Connecticut law already prohibited steering and mandated some written disclosures*, see* Conn. Gen. Stat. § 38a-354, the State could have rationally concluded that claims administrators owning repair shops nevertheless were able to exercise undue influence and stifle consumer choice. Safelite's position that PA 13-67(c)(2) was unnecessary given the absence of consumer complaints and the existence of other laws to protect consumers is of no moment here, because the State does not bear the burden of producing evidence or empirical data to sustain rationality and can rely instead upon rational speculation. *See Thompson*, 252 F.3d at 582. Safelite also asserts that PA 13-67(c)(2) will not materially advance consumer choice, because providing consumers with the name of just one additional name will not promote overall fair competition, and the law is under-inclusive in that it only applies to Safelite and one other company. Under rational basis review, however, the law may be valid even if the State had alternate means of achieving its goals or if the law is "under-inclusive," i.e., only combats a limited aspect of the problem. *See New York State Rest. Ass'n*, 556 F.3d at 133 n.22.

Because the Court concludes that PA 13-67(c)(2) is rationally related to the State's goal of protecting consumer choice and preventing steering, Plaintiffs have not

demonstrated that they are likely to succeed on the merits of their First Amendment claim.

## III.     Conclusion

For the foregoing reasons, Plaintiffs' motion [Doc. # 2] for a preliminary injunction is DENIED.

IT IS SO ORDERED.

_____/s/_____

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 18th day of December, 2013.