# UNITED STATES COURT OF APPEALS
# FOR THE
# SECOND CIRCUIT

**MANDATE**

At a Stated Term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 4th day of September, two thousand and fourteen.

Before:    Ralph K. Winter,
    John M. Walker, Jr.,
    José A. Cabranes,
        *Circuit Judges*.

_____

Safelite Group, Inc., Safelite Solutions LLC,

Plaintiffs - Appellants,

                                    **JUDGMENT**
                                    Docket No. 13-4761

v.

George Jepsen, in his official capacity as Attorney General for the State of Connecticut, Thomas Leonardi, in his official capacity as the Commissioner of the Connecticut Insurance Department,

Defendants - Appellees.

_____

The appeal in the above captioned case from an order of the United States District Court for the District of Connecticut was argued on the district court's record and the parties' briefs. Upon consideration thereof,

IT IS HEREBY ORDERED, ADJUDGED and DECREED that the order of the district court is VACATED and the case is REMANDED to the district court with instructions to enter a preliminary injunction and for such further proceedings as may be appropriate in accordance with the opinion of this court.

                                    For The Court:

                                    Catherine O'Hagan Wolfe,
                                    Clerk of Court

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

MANDATE ISSUED ON 09/25/2014

13-4761-cv
**Safelite Group, Inc. v. Jepsen**

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2013

(Argued: May 19, 2014                    Decided: September 4, 2014)

Docket No. 13-4761-cv

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

SAFELITE GROUP, INC., SAFELITE SOLUTIONS LLC,

     Plaintiffs-Appellants,

        v.

GEORGE JEPSEN, in his official capacity as Attorney General for the State of Connecticut, THOMAS LEONARDI, in his official capacity as the Commissioner of the Connecticut Insurance Department,

     Defendants-Appellees.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

B e f o r e:   WINTER, WALKER, and CABRANES, Circuit Judges.

    Appeal from the denial by the United States District Court for the District of Connecticut (Janet Bond Arterton, Judge) of a preliminary injunction against enforcement of Connecticut's law, "An Act Concerning Automotive Glass Work," Public Act 13-67. We vacate and order a preliminary injunction on First Amendment grounds.

                                  JAY P. LEFKOWITZ (Steven J. Menashi, Kirkland & Ellis LLP, New York, NY; Benjamin Carl Jensen, Robinson & Cole LLP, Hartford Connecticut, on the brief), Kirkland & Ellis LLP, New York, NY, for Plaintiffs-Appellants.

1

                                          JOSEPH J. CHAMBERS, Assistant Attorney General (Matthew J. Budzik, Assistant Attorney General, on the brief) for George Jepsen, Attorney General for the State of Connecticut, Hartford, CT, for Defendants-Appellees.

WINTER, Circuit Judge:

Safelite Group, Inc., and its subsidiary, insurance-claims administrator Safelite Solutions LLC, (collectively "Safelite"), appeal from a denial of a preliminary injunction against enforcement of Connecticut's Public Act 13-67 ("PA 13-67"), "An Act Concerning Automotive Glass Work." Safelite claims that the Act violates the First Amendment because it is an impermissible constraint on commercial speech.

We hold that the district court erred in applying rational basis review under Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio, 471 U.S. 626 (1985), but rather should have applied intermediate scrutiny under Central Hudson Gas & Electric Corp. v. Public Service Commission of New York, 447 U.S. 557 (1980). Concluding that the statute cannot survive such scrutiny on the present record, we vacate and order an injunction preventing enforcement of Public Act 13-67(c)(2).

BACKGROUND

We begin by describing the commercial context. Safelite operates an insurance claims management company throughout the

2

United States. Its affiliate, Safelite AutoGlass, operates in Connecticut and provides auto-glass repair and replacement.

When car owners with a claim concerning auto-glass call their insurance company, they may, depending on the insurance company, be connected to Safelite Solutions. During this call, a Safelite Solutions representative reads a script that explains the consumer's repair options. If practicable, the script recommends Safelite AutoGlass to do the auto-glass repairs. If a Safelite AutoGlass facility is not available, the agent may recommend a shop that is on a list of seventy non-affiliated glass-repair shops pre-approved by Safelite Solutions. In order to be included on this list, the local repair shop must meet certain criteria and qualifications, and sign a participation agreement.

Under pre-existing Connecticut law, Conn. Gen. Stat. § 38a-354 (2014), automobile insurers and claims administrators are prohibited from requiring where repairs should be made and must give a notice of a right to choose on appraisals or estimates. According to the statute, appraisers may not "require that appraisals or repairs . . . be made in a specified facility or repair shop or shops." Id. § 38a-354(a). Moreover,

> [n]o insurance company doing business in [Connecticut], or agent or adjuster for such company shall (1) require any insured to use a specific person for the provision of automobile physical damage repairs, automobile glass replacement, glass repair

3

```
          service or glass products, or (2) state that
          choosing a facility other than a motor
          vehicle repair shop participating in a motor
          vehicle program established by such company
          will result in delays in repairing the motor
          vehicle or a lack of guarantee for repair
          work.
```

Id. § 38a-354(b). Furthermore, any written appraisal or estimate must contain the following language in bold and in no less than ten-point font:

```
                    NOTICE:
          YOU HAVE THE RIGHT TO CHOOSE THE LICENSED
          REPAIR SHOP WHERE THE DAMAGE TO YOUR MOTOR
          VEHICLE WILL BE REPAIRED.
```

Id. § 38a-354(c). Safelite alleges its compliance with this law. Although not required by law, the Safelite Solutions script informs consumers of its affiliation with Safelite AutoGlass.

The Connecticut General Assembly undertook an examination of the business model adopted by Safelite with regard to auto-glass repair. In May 2013, it passed PA 13-67, which took effect on January 1, 2014. The Act reads in relevant part:

```
          No glass claims representative for an
          insurance company doing business in this
          state or a third-party claims administrator
          for such company shall provide an insured
          with the name of, schedule an appointment for
          an insured with or direct an insured to, a
          licensed glass shop that is owned by (A) such
          company, (B) such claims administrator, or
          (C) the same parent company as such insurance
          company or claims administrator, unless such
          representative or claims administrator
          provides the insured with the name of at
          least one additional licensed glass shop in
          the area where the automotive glass work is
          to be performed.
```

4

PA 13-67(c)(2). Thus, Section 38a-354 prohibits insurance companies and claims administrators from requiring insureds to patronize their affiliates for repair purposes. PA 13-67 additionally prohibits them from mentioning their affiliates with regard to glass claims unless they also name a competitor.

The legislative history of PA 13-67 revealed no consumer dissatisfaction with Safelite's business model but substantial concerns on the part of unaffiliated glass dealers. While the Connecticut Insurance Department stated that current law, as described above, provided adequate protection for consumers,[1] several legislators stated that PA 13-67 was needed to protect local glass dealers not affiliated with Safelite.[2]

---

[1] At hearings before the Insurance and Real Estate Committee of the Connecticut General Assembly, the Connecticut Insurance Department testified that the existing law, section 38a-354, was "not problematic for consumers." The Department also testified that its Consumer Affairs Division "ha[d] received no complaints regarding" section 38a-354, that it "believe[d] consumers [were] adequately protected by current law and that [PA 13-67 was] unnecessary."

[2] During the House Session on May 7, 2013, Representative Robert Megna spoke in support of the bill that would become PA 13-67, stating that it was designed to "help out those small businesses from disappearing . . . [i.e.,] small businesses that employ people, spend money, do economic development in . . . our state." He also stated that "[t]hese are small businesses that are located here in the state, . . . that have property, that buy things, that . . . employ people here in the state." Representative David Yaccarino also spoke in support of the House bill, saying, "I'd like to see a more fair playing field for both Safelite and mainly mom and pops." He also said, "[for] most of the mom-and-pop shops, the glass is Connecticut, it's all from Connecticut, all Connecticut jobs."
   Representative Anthony D'Amelio mentioned that he was in support of the law in order to protect "the people that contribute to the little leagues in our town. These are the people that contribute to functions in our churches and they're literally being squeezed out of the marketplace."
   During the Senate Session on May 22, 2013, Senator Kevin Kelly also spoke in support of the bill in order to help local businesses: "[T]he underlying purpose of the bill is not only to provide notice to the insured,

Safelite brought the present action on July 26, 2013, challenging PA 13-67 as infringing its First Amendment rights and constituting discrimination against interstate commerce under the Commerce Clause. Safelite moved for a preliminary injunction, which was denied by the district court. Safelite brought the present appeal. The law took effect on January 1, 2014. Safelite states, without objection, that it has since complied with PA 13-67.

## DISCUSSION

We review a district court's denial of a motion for a preliminary injunction for abuse of discretion. Int'l Dairy Foods Ass'n v. Amestoy, 92 F.3d 67, 70 (2d Cir. 1996). We review the district court's legal conclusions de novo. County of Seneca v. Cheney, 12 F.3d 8, 11 (2d Cir. 1993). In "First Amendment cases, 'an appellate court has an obligation to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression.'" N.Y. Progress & Prot. PAC v. Walsh, 733 F.3d 483, 486 (2d Cir. 2013) (quoting Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 499 (1984)).

a) <u>Rational Basis Review versus Intermediate Scrutiny</u>

---

but also to give an opportunity for local dealers to participate on an equal footing with, I'm going to say, other, large glass dealers."

When a party challenges a law or regulation on the basis that it restricts or impermissibly regulates speech protected by the First Amendment, we first look at the genre of speech involved.

It is undisputed that the speech in this case is commercial speech "entitled to the protection of the First Amendment, albeit to protection somewhat less extensive than that afforded 'noncommercial speech.'" Zauderer, 471 U.S. at 637. "The States and the Federal Government are free to prevent the dissemination of commercial speech that is false, deceptive, or misleading, or that proposes an illegal transaction. Commercial speech that is not false or deceptive and does not concern unlawful activities, however, may be restricted only in the service of a substantial governmental interest, and only through means that directly advance that interest." Id. at 638 (citing Central Hudson, 447 U.S. at 566) (other internal citations omitted).

The regulation of commercial speech is subject to different levels of review, depending on the nature of the law. In Central Hudson, the Court established that a restriction on commercial speech is subject to intermediate scrutiny, that is, a determination of whether the restriction directly advances a substantial governmental interest and is not overly restrictive. 447 U.S. at 564. In Zauderer, however, the Court created an exception that an informational disclosure law -- as opposed to a

prohibition on speech -- was subject to rational review, that is, a determination of whether the required disclosure is reasonably related to the state's interest. 471 U.S. at 651.

The district court found that PA 13-67 was simply an informational disclosure law and accordingly applied the rational basis review test. Safelite Grp. v. Jepsen, No. 3:13cv1068 (JBA), 2013 WL 6709240, at *7 (D. Conn. Dec. 18, 2013). We disagree and hold that the district court should have applied intermediate scrutiny under Central Hudson.

Zauderer involved a state law that regulated commercial speech by attorneys, specifically whether an attorney could "solicit[] business by running newspaper advertisements containing nondeceptive illustrations and legal advice, and whether [the] State [could] seek to prevent potential deception of the public by requiring attorneys to disclose in their advertising certain information regarding fee arrangements." 471 U.S. at 629. The plaintiff in Zauderer was an attorney who "ran a small advertisement in the Columbus Citizen Journal advising its readers that his law firm would represent defendants in drunken driving cases and that his clients' 'full legal fee would be refunded if they were convicted of DRUNK DRIVING.'" Id. at 629-30 (alterations omitted). The attorney was disciplined by the Office of Disciplinary Counsel of the Supreme Court of Ohio for violating the Ohio Code of Professional Responsibility, which

requires that a client bear certain costs even if the client loses. Id. at 631, 634-35.

In applying rational basis review, the Court found that by requiring the attorneys to "state that the client may have to bear certain expenses even if he loses, Ohio has not attempted to prevent attorneys from conveying information to the public; it has only required them to provide somewhat more information than they might otherwise be inclined to present." Id. at 650. The Court went on to say: "We have, to be sure, held that in some instances compulsion to speak may be as violative of the First Amendment as prohibitions on speech." Id. (citing Wooley v. Maynard, 430 U.S. 705 (1977) (holding that a law requiring New Hampshire license plates to display the state's motto, "Live Free or Die," violated the First Amendment rights of the owners who contested the law)); Miami Herald Publ'g Co. v. Tornillo, 418 U.S. 241 (1974) (holding that Florida's "right to reply" statute granting a political candidate equal space to answer criticism in newspapers violated the newspaper's First Amendment rights)). The asserted governmental interest in Zauderer was to ensure that attorneys advertise "in a dignified manner," 471 U.S. at 647, and to "ensure that attorneys . . . do not use false or misleading advertising to stir up meritless litigation against innocent defendants," id. at 643.

9

In contrast, Central Hudson involved a utility company's challenge to a regulation of the New York Public Service Commission that banned any advertising that "promot[ed] the use of electricity" because the state's utility system could not "continue [to] furnish[] all customer demands for the 1973-1974 winter." 447 U.S. at 558-59. The Court outlined the following test for examining whether such restrictions on commercial speech are protected by the First Amendment:

> The State must assert a substantial interest to be achieved by restrictions on commercial speech. Moreover, the regulatory technique must be in proportion to that interest. The limitation on expression must be designed carefully to achieve the State's goal. Compliance with this requirement may be measured by two criteria. First, the restriction must directly advance the state interest involved; the regulation may not be sustained if it provides only ineffective or remote support for the government's purpose. Second, if the governmental interest could be served as well by a more limited restriction on commercial speech, the excessive restrictions cannot survive.

Id. at 564. The Court held that the regulation violated the First Amendment rights of the utility company because the law was overly restrictive. Id. at 570-71.

In interpreting these Supreme Court precedents, our previous cases have drawn a distinction between "standards of review [to be applied] to laws mandating commercial speech disclosures and laws restricting commercial speech." Conn. Bar Ass'n v. United States, 620 F.3d 81, 93 n.15 (2d Cir. 2010). In National

11 of 20

Electric Manufacturers Association v. Sorrell, 272 F.3d 104, 107 (2d Cir. 2001), we upheld a statute that "require[d] manufacturers of some mercury-containing products to label their products and packaging to inform consumers that the products contain mercury and, on disposal, should be recycled or disposed of as hazardous waste." In New York State Restaurant Ass'n v. New York City Board of Health, 556 F.3d 114 (2d Cir. 2009) ("NYSRA"), we upheld a New York City regulation that required certain restaurants to post calorie content information on their menus and menu boards. We found that "the First Amendment is not violated, where[,] as here, the law in question mandates a simple factual disclosure of caloric information and is reasonably related to New York City's goals of combating obesity." Id. at 118.

In both NYSRA and Sorrell, we relied on that fact that

> [c]ommercial disclosure requirements are treated differently from restrictions on commercial speech because mandated disclosure of accurate, factual, commercial information does not offend the core First Amendment values of promoting efficient exchange of information or protecting individual liberty interests. Such disclosure furthers, rather than hinders, the First Amendment goal of the discovery of truth and contributes to the efficiency of the "marketplace of ideas."

Sorrell, 272 F.3d at 113-14 (emphasis supplied).

Indeed, in Sorrell, we stated that "Zauderer, not Central Hudson [ ], describes the relationship between means and ends demanded by the First Amendment in compelled commercial

disclosure cases.  The Central Hudson test should be applied to statutes that *restrict* commercial speech."  Id. at 115 (citation omitted).  Because the district court concluded that the law mandated the disclosure of "purely factual and uncontroversial information," see Safelite Grp., Inc. v. Jepsen, 988 F. Supp. 2d 199, 207 (D. Conn. 2013) (quoting Zauderer, 471 U.S. at 651), it concluded that rational basis review must apply.  See also id. at 207 (noting that "Safelite acknowledges that PA 13-67(c)(2) contains no restrictions on speech," but rather creates a "trigger," which mandates speech only if Safelite chooses to direct claimants to its affiliates).

On a cursory review, our precedent arguably supports the district court's conclusion that this law simply requires disclosure of accurate, factual information.  But all of our case law applying Zauderer review to factual, commercial disclosure -- indeed, as far as we know, all federal cases applying Zauderer in that context -- has dealt with disclosure requirements about a company's own products or services.  See Sorrell, 272 F.3d at 116 (listing "innumerable" state and federal regulations that require disclosure, all of which appear to require information about the commercial speakers' own product or service, not about competitors').  This distinction is important, indeed, dispositive in this case.

There is a good reason for this. Prohibiting a business from promoting its own product on the condition that it also promote the product of a competitor is a very serious deterrent to commercial speech. Moreover, such laws are highly likely to further covertly protectionist, rather than consumer information, goals -- in particular, by protecting existing businesses, which may be well known, against new entrants. In the present case, for example, competitors, deeming Safelite to have an advantage in contacting potential consumers, successfully sought the challenged legislation. Safelite's competitive advantage, however, is in lower advertising costs (in the broadest sense). Such lower costs are a legitimate competitive advantage.

On that basis, because the disclosure required here compels speech that goes beyond the speaker's own product or service, we conclude that intermediate scrutiny applies to PA 13-67. As noted, PA 13-67 restricts insurers and claims administrators from mentioning the name of, or scheduling an appointment with, an affiliated glass company unless they also give the name of a competing glass company in the area. The law does not mandate disclosure of any information about products or services of affiliated glass companies or of the competitor's products or services. Instead, it requires that insurance companies or claims administrators choose between silence about the products and services of their affiliates or give a (random) free

13

1   advertisement for a competitor.  This is a regulation of content
2   going beyond disclosure about the product or services offered by
3   the would-be speaker.  Indeed, it prevents the speaker from
4   making such disclosure by requiring advertisements for a
5   competitor and thereby deters helpful disclosure to consumers.
6   Unlike the earlier mentioned cases that applied Zauderer's
7   rational basis test, the speech requirement here does more to
8   inhibit First Amendment values than to advance them.
9   Accordingly, we conclude that PA 13-67 requires the application
10  of intermediate scrutiny.  Cf. Evergreen Ass'n v. City of New
11  York, 740 F.3d 233, 250-51 (2d Cir. 2014) (finding that an
12  ordinance requiring pregnancy service centers to disclose that
13  "the New York City Department of Health and Mental Hygiene
14  encourages women who are or may be pregnant to consult with a
15  licensed provider" violated the First Amendment under both
16  intermediate and strict scrutiny because it "require[d] pregnancy
17  centers to advertise on behalf of the City").
18  b) Application of Central Hudson
19      Under Central Hudson, we must examine whether:  (i) the
20  regulated expression is false or misleading; (ii) the government
21  interest is substantial; (iii) PA 13-67 directly and materially
22  advances the governmental interest asserted; and (iv) PA 13-67 is
23  no more extensive than necessary to serve that interest.   447
24  U.S. at 566.

14

First, we determine whether Safelite's commercial speech is tainted by lies, misleading statements, or an illegal purpose, all of which may be regulated. <u>Central Hudson</u>, 447 U.S. at 563-64 ("The government may ban forms of communication more likely to deceive the public than to inform it, or commercial speech related to illegal activity.  If the communication is neither misleading nor related to unlawful activity, the government's power is more circumscribed." (internal citations omitted)).

There is no claim, much less evidence, that Safelite's communications to its customers were false, misleading, or illegal.  Indeed, there is no claim of consumer complaints about the effect of Safelite's business model.  <u>See</u> Note 1, <u>supra</u>.  We therefore must conclude that PA 13-67 does not meet the first prong of <u>Central Hudson</u>'s intermediate scrutiny test.

We turn now to whether Connecticut's interest in restricting Safelite's speech is substantial, and whether PA 13-67 directly and materially advances that interest.  Appellees argue that the government has a substantial interest in "protecting consumer choice, preventing steering, and combatting the undue influence of self-interested insurance claims adjusters."

As an initial matter, in light of the record evidence that the legislation at issue was designed to benefit Safelite's competitors, <u>see</u> Note 2, <u>supra</u>, we are skeptical that the government's asserted consumer protection interests are genuine

15

and not merely post-hoc rationalizations.  See Note 1, supra.
However, even if we were to acknowledge the government's
substantial interest in consumer choice, PA 13-67 advances that
interest, if at all, in an indiscernible or de minimis fashion.
As became clear at oral argument, price is likely irrelevant to
the consumer because the insurance company pays everything over a
deductible.  As is also clear from the history of the law, the
record, and oral argument, there is no issue regarding the
quality of glass provided by Safelite compared to that provided
by competing glass dealers.  Nor is there an issue as to the
quality of relative repair services.  Appellees repeatedly state
that the law furthers "consumer choice," but consumer choice is a
means to an end:  the maximization of consumer satisfaction.  By
having to mention only the name of a competitor, Safelite does
not provide the consumer with information potentially enhancing
that satisfaction.

    This brings us to the fourth and final prong in the Central
Hudson test:  whether PA 13-67 is more restrictive than necessary
to effectuate the government's legitimate interests.  "The
dictates of Central Hudson do not require [a government] to adopt
the least restrictive means of advancing its asserted interests,"
nor "that there be no conceivable alternative, but only that the
regulation not burden substantially more speech than is necessary
to further the government's legitimate interests."  Clear Channel

16

Outdoor, Inc. v. City of New York, 594 F.3d 94, 104 (2d Cir. 2010) (internal citations and quotation marks omitted).

Pre-existing law provides a thoroughly effective way of protecting meaningful consumer choice.  Before PA 13-67 took effect, the script that Safelite employees used (and continue to use) stated that its customers had the right to choose any repair shop.  See Conn. Gen. Stat. §§ 38a-354(b)(1), (c). Consumers were further protected from undue steering and influence under the pre-existing law, which prohibited Safelite from "stat[ing] that choosing a facility other than a motor vehicle repair shop participating in a motor vehicle program established by [Safelite] will result in delays in repairing the motor vehicle or a lack of guarantee for repair work."  Id. § 38a-354(b)(2).[3]

In addition, PA 13-67 is more extensive than necessary.  In its brief, Connecticut acknowledges a number of alternative proposals that were rejected by the State legislature.  At least one of these -- prohibiting steering unless the consumer was first informed of their right to choose a glass shop -- would have served the same governmental interests, but would have been less burdensome on Safelite's speech rights than requiring Safelite to advertise the name of a direct competitor.  Such an

---

[3] Additionally, even though it is not required to do so by law, Safelite independently discloses that it is affiliated with Safelite AutoGlass. Requiring such disclosure by law would clearly be less restrictive than PA 13-67.

17

alternative would simply be a straight-forward disclosure about Safelite's services and its relationship with the insured.

Finally, we conclude that PA 13-67 is also underinclusive, because it only applies to third-party insurance claims administrators who also own an affiliated glass shop. It does not apply to insurance companies themselves or to claims administrators who do not own an affiliated glass shop. Accordingly, customers of those companies would not get the information about glass shops that Connecticut contends is necessary to protect consumer choice.

## CONCLUSION

For the reasons stated, we vacate the district court's ruling. Because the case presents few issues of fact or law, and those issues are easily resolved,[4] as discussed above, we order a preliminary injunction against enforcement of PA 13-67.

We remand the cause to the district court with instructions to enter a preliminary injunction and for such further

---

[4] The requirements for a party seeking a preliminary injunction are well-settled. First, in every case, the moving party must show "irreparable harm." Int'l Dairy Foods, 92 F.3d at 70. A "direct limitation on speech," including those imposed via the regulated, mandatory communication of specific content, "creates a presumption of irreparable harm," Evergreen Ass'n, 740 F.3d at 246, and, seeing no rebuttal of this presumption, we hold that the first prong has been satisfied. Second, where "the injunction at issue stays government action taken in the public interest pursuant to a statutory scheme," the movant must demonstrate "likelihood of success on the merits." Int'l Dairy Foods, 92 F.3d at 70 (internal citations, quotation marks, and alterations omitted). As our earlier discussion demonstrates, Safelite has clearly met its burden under the second prong and is therefore entitled to relief.

1 proceedings as may be appropriate in the circumstances and
2 consistent with this Opinion.
3
4
5
6